IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES LIFE INSURANCE COMPANY OF AMERICAN IN THE CITY OF NEW YORK,<br><br>Plaintiff,<br><br>vs.<br><br>RONNIE JAMES HERRING, M.D.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CASE NO: CV-1071<br>)<br>)<br>)<br>) |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO DISMISS**

COMES NOW the Defendant, Ronnie James Herring, M.D., by and through undersigned counsel, and hereby responds to Plaintiff's Motion to Dismiss by showing unto the Court the following:

1). Plaintiff's Motion to Dismiss is based almost exclusively upon its allegation that Dr. Herring failed to disclose to Plaintiff back in 2001 that he suffered from Narcolepsy when he completed and then submitted his application for disability insurance to the Plaintiff.

2). However, Dr. Herring did disclose to Plaintiff that he suffered from Narcolepsy (among other things) back in 2001 when he completed and submitted his application for disability insurance to Plaintiff. (Exhibit "A").

**ARGUMENT**
**DEFENDANT'S COUNTERCLAIMS**

1). <u>Fraudulent Misrepresentation</u>

Dr. Herring's first counterclaim against the Plaintiff is a claim for fraudulent misrepresentation. To state a claim of fraudulent misrepresentation, a plaintiff (Defendant in the

instant case) must allege facts showing (1) that the defendant (Plaintiff) made a false representation; (2) of a material existing fact; (3) on which the plaintiff (Defendant) reasonably relied; and (4) which proximately caused injury or damage to the plaintiff (Defendant). Bethel v. Thorn, 757 So.2d 1154 (Ala. 1999). The misrepresentations made by Plaintiff to Dr. Herring in the instant case pertained to Plaintiff's obligations under the insurance contract that began at the time Dr. Herring made his initial premium payment and the insurance contract was entered between the parties. Specifically, Plaintiff represented to the Dr. Herring that if he purchased and maintained Plaintiff's disability insurance policy and Dr. Herring ever subsequently became disabled and unable to perform the duties of his occupation, Dr. Herring would receive disability insurance proceeds from the Plaintiff. (Exhibit "A"). Based upon these representations, Dr. Herring purchased and maintained the disability insurance policy at issue from the Plaintiff. (Exhibit "A"). Last year, Dr. Herring became disabled and unable to perform the duties of his occupation and filed a claim with the Plaintiff for disability insurance benefits that he reasonably believed (based upon the aforementioned representations) were due to him. (Exhibit "A"). However, Plaintiff has refused to pay Dr. Herring his disability benefits as previously represented to Dr. Herring (the representations thus became misrepresentations). Therefore, the representations made to Dr. Herring in the instant case meet all of the elements necessary to sustain a fraudulent misrepresentation claim against the Plaintiff.

    2).    Fraudulent Suppression

Dr. Herring's second counterclaim against the Plaintiff is a claim for fraudulent suppression. In order for a plaintiff (Defendant) to prevail on a fraudulent suppression claim, he/she must show (1) the defendant (Plaintiff) had a duty to disclose a material fact; (2) the defendant (Plaintiff) concealed or failed to disclose a material fact; (3) the defendant's (Plaintiff's)

concealment or failure to disclose the material fact induced the plaintiff (Defendant) to act or refrain for acting; and (4) that the plaintiff (Defendant) suffered actual damage as a proximate result. Locklar Dodge City, Inc. v. Kimbrell, 703 So. 2d 303 (Ala.1997). The Alabama Supreme Court has held that where one party has superior knowledge of a fact and the other party's having the same knowledge would cause the other party to take a different course of action, then a duty to disclose arises, if the other party cannot discover the fact himself. Independent Life and Acc. Ins. Co. v. Harrington, 658 So.2d 892 (Ala. 1994); citing Interstate Truck Leasing, Inc. v. Bender, 608 So.2d 716 (Ala.1992). In our case, in addition to making the abovementioned misrepresentations to Dr. Herring, Plaintiff also fraudulently concealed material facts from Dr. Herring which kept him from seeking out other disability insurance coverage from another insurance company and caused him to purchase and maintain a policy of insurance that he would not have otherwise purchased and maintained. (Exhibit "A"). Specifically, Plaintiff failed to disclose to Dr. Herring that, in the event that he did become disabled and unable to perform the duties of his occupation, Plaintiff would not pay Dr. Herring his disability insurance benefits as represented, that Plaintiff would manufacture (create) reasons to deny Dr. Herring's claim for disability benefits, and that Plaintiff would conceal documents and information and claim that said documents and information were not provided to Plaintiff by Dr. Herring. (Exhibit "A"). Because of Plaintiff's concealment of the aforementioned facts, Dr. Herring purchased and maintained the disability insurance policy at issue that he would have not have otherwise purchased and maintained and did not seek out other disability insurance coverage from any other insurance company. (Exhibit "A"). Consequently, Dr. Herring also states a viable cause of action for fraudulent concealment against the Plaintiff.

    3). <u>Breach of Contract</u>

As I am sure all are aware, to establish a cause of action for bad faith, it must be first

established that an insurance contract existed between the parties and that there has been a breach thereof. A party can establish a breach of that contract by showing (1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's non-performance, and (4) damages. State Farm v. Slade, 747 So.2d 293, 302 (Ala.1999); citing Southern Medical Health Systems Inc. v. Vaughn, 669 So.2d 98, 99 (Ala.1995). In the instant case, it is undisputed that an insurance contract existed between Dr. Herring and Plaintiff. Plaintiff simply denies that it breached said insurance contract by denying Dr. Herring's claim for benefits by claiming he failed to disclose that he suffered from Narcolepsy. As stated above, Plaintiff's argument regarding the breach of contract issue rests solely upon this allegation. However, as set forth above, Dr. Herring did disclose to Plaintiff that he suffered from Narcolepsy (among other things) back in 2001. (Exhibit "A"). The reasonable inference to be drawn from the evidence is that Plaintiff, at the time it denied Dr. Herring's claim, hoped that he had not kept copies of what he had submitted. Dr. Herring has put forth evidence that (1) a contract of insurance existed between Plaintiff and Dr. Herring, (2) that Dr. Herring performed under the contract by paying his premium payments, (3) that Plaintiff did not perform under the contract in that it manufactured and created its own reason to deny Dr. Herring's claim for benefits, and (4) that Dr. Herring has been damaged in that he did not and has not received the disability benefits due to him. Therefore, Defendant's Motion to Dismiss as it relates to Dr. Herring's breach of contract cause of action is due to be denied as well.

    4).    Bad Faith

Bad faith was first recognized in Alabama in Chavers vs. National Security Fire and Casualty Co., 405 So.2d 1 (Ala.1981). In Chavers, the Court recognized that every contract for a policy of insurance contains an implied covenant of good faith and fair dealing. Id. Breach of

that covenant provides in injured party with a tort action for bad faith, not-withstanding the fact that the acts complained of may also constitute a cause of action for breach of contract. Chavers, 405 So.2d at 1, *quoting* Childs v. Mississippi Valley Title Ins. Co., 359 So.2d 1146 (Ala. 1978). As Justice Jones stated:

> The law will not allow an insurer to willfully refuse to evaluate or honor a claim with the knowledge that the avowed purpose of the insurance contract was to protect the insured at his weakest and most perilous time of need. Chavers, 405 So.2d at 6, *quoting* Vincent v. Blue Cross Blue Shield, 373 So. 2d, 1054 (Ala. 1979).

Alabama has recognized two types of bad faith failure to pay insurance benefits cases; the "normal" bad faith case, and the "abnormal" bad faith case. See National Insurance Ass'n v. Sockwell, 2002 WL 399041, pg 16; Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050 (Ala. 1987); Blackburn v. Fidelity & Deposit Co., 667 so.2d 661, 669 (Ala. 1995). The elements of a "normal" bad faith action are as follows:

> (a) An insurance contract between the parities and the breach thereof by the Defendant.
>
> (b) An intentional refusal to pay the claim.
>
> (c) The absence of any reasonable, legitimate, or arguable reason for that refusal.
>
> (d) The insurers actual knowledge of the absence of any legitimate or arguable reason.
>
> (e) If the intentional failure to determine the existence of a lawful basis is relied upon, the Plaintiff must prove the insurers intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim. Cincinnati Insurance vs. Little, 413 So. 2d 891 (Ala. 1983).

5

"Abnormal" bad faith cases have been recognized by Alabama in instances where the plaintiff has produced substantial evidence that the insurer (1) intentionally or recklessly failed to investigate the plaintiff's claim; (2) intentionally or recklessly failed to properly subject the plaintiff's claim to a cognitive evaluation or review; (3) created its own debatable reason for denying the plaintiff's claim; or (4) relied on an ambiguous portion of the policy as a lawful basis to deny the plaintiff's claim. National Insurance Ass'n v. Sockwell, 2002 WL 399041, pg. 16. The instant case is an "abnormal" bad faith type of case. As set forth above, on or about December 6, 2007, Plaintiff denied Dr. Herring's claim for disability benefits by claiming that he had not disclosed that he suffered from Narcolepsy and hoped that he had not kept copies of the documents he had submitted. (Exhibit "B"). However, an insurer cannot create or manufacture its own debatable reason to deny a claim and avoid bad faith punitive damage liability. See National Insurance Ass'n v. Sockwell, 2002 WL 399041; State Farm Fire & Cas. Co. v. Slade, 747 So.2d 293, 303-307.

## Conclusion

Dr. Herring has established claims for fraudulent misrepresentation, suppression, breach of contract and bad faith pertaining to the insurance coverage purchased from the Plaintiff. Therefore, the Plaintiff's Motion to Dismiss to all of these causes of action is due to be denied.

                                        //Christoper E. Sanspree//
                                      CHRISTOPHER E. SANSPREE (SAN048)
                                      Attorney for Plaintiff

OF COUNSEL:

**SANSPREE & McRIGHT, LLC**
603 Martha Street
Montgomery, Alabama 36104
(334) 262-1001
(334) 262-1002 facsimile

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon all counsel for the Defendants as listed below by placing a copy of the same in the U.S. Mail, postage prepaid and properly addressed on this the 8th day of **February, 2008**.

Mr. Michael D. Mulvaney
Mr. Thomas J. Butler
Ms. Grace L. Kipp
**MAYNARD, COOPER & GALE**
1901 Sixth Avenue North
2400 AmSouth Harbert Plaza
Birmingham, AL  35203-2618

                                         //Christoper E. Sanspree//
                                         OF COUNSEL

## AFFIDAVIT OF RONNIE JAMES HERRING, M.D.

STATE OF ALABAMA                )

COUNTY OF MONTGOMERY    )

Before me, the undersigned, a Notary Public in and for the State of Alabama at Large, personally appeared Ronnie James Herring, M.D., who is known to me and being by me first duly sworn, on oath deposes and says as follows:

My name is Ronnie James Herring, M.D., and I am over the age of nineteen (19) and have personal knowledge of the facts set forth below: I have attached to this affidavit a true and correct copy of an addendum to my disability insurance application that I completed and submitted to United States Life Insurance Company of America in the City of New York with my insurance application back in 2001. I fully disclosed at the time of application that I suffered from and was being treated for Narcolepsy, among other things. The reason I decided to purchase the insurance and filled out the application with United States Life Insurance Company of America in the City of New York was because it was represented to me by the prospective insurer that if I purchased and maintained the disability insurance policy and then ever became disabled and unable to perform the duties of my occupation, I would receive disability insurance proceeds from United States Life Insurance Company of America in the City of New York. (Exhibit "A"). Last year, I became disabled and unable to perform the duties of my occupation and filed a claim with United States Life Insurance Company of America in the City of New York for disability insurance benefits that I reasonably believed were due to me. However, United States Life Insurance Company of America in the City of New York has refused to pay me my disability benefits as previously represented that it would by claiming that I did not

1



disclose that I suffered from Narcolepsy, among other things that it alleges that I failed to disclose on the initial application I submitted. As stated above, I disclosed to United States Life Insurance Company of America in the City of New York that I suffered from various health conditions/problems, which included but was not limited to, Narcolepsy at the time I submitted my initial application to the prospective insurer back in 2001. If I had known that United States Life Insurance Company of America in the City of New York would not pay me my disability benefits as represented and that it would conceal documents and information and manufacture reasons to deny my claim for disability benefits, then I would not have purchased and maintained the disability insurance policy with United States Life Insurance Company of America in the City of New York. In fact, if I had known the above, I would have sought out other insurance companies to purchase disability insurance from.

I understand that this Affidavit may be used in the case of Ronnie James Herring v. United States Life Insurance Company of America in the City of New York, et al. Case Number CV-07-1071

The above statement is true and accurate to the best of my knowledge.

*/s/ Ronnie James Herring*
RONNIE JAMES HERRING

Sworn to and subscribed before me this ___8___ day of February, 2008.

*/s/ E Kidd*
NOTARY PUBLIC
My Commission Expires:

2

NOTARY PUBLIC STATE OF ALABAMA AT L...
MY COMMISSION EXPIRES: Sept 23.
BONDED THRU NOTARY PUBLIC UNDERW

**EAST ALABAMA MEDICAL CENTER**
**PROGRESS NOTES**

| FAMILY NAME | FIRST NAME | MIDDLE NAME |
|---|---|---|
| ATTENDING PHYSICIAN | ROOM NO. | HOSP. NO. |
| DATE | | 19 |

EXHIBIT A

| DATE | NOTES |
|---|---|

## Addendum

The information provided below is an addendum to my application for disability income insurance, and to any other attached/associated documents or pages of information. These statements are true to the best of my belief, knowledge, and recall of information. However, I request that you also order and obtain copies of all of my medical records from each healthcare provider, and/or institution, to further clarify more specific details regarding these conditions, as well as identify any additional information about my medical/surgical history that may have been inadvertently omitted.

### Part A

(1.) As listed, Dr. Daniel Hartigan (Mayo Clinic - Jacksonville, FL) was my primary care/family physician while I was a resident in training at Mayo Clinic-Jacksonville. From 1996 through 2000, Dr. Hartigan provided care and treatment to me for various ailments/maladies.

(2.) During my time at Mayo Clinic - Jacksonville, I was diagnosed with Narcolepsy. Dr. Hartigan referred me to a sleep specialist within the Mayo Clinic, Siong Chi Lin, M.D., who made this diagnosis. Currently, my treatment of Narcolepsy is with the use of several prescription medications. My current medications, as well as those used in the past, can be obtained and verified from the medical records of the doctors identified.

(3.) In addition, I was also referred (by Dr. Hartigan) to an ENT physician, also within the Mayo Clinic system. At this time, I cannot recall his name, and if my memory serves me correctly, he saw

(cont)

Nurs. Serv. Form #141

**EAST ALABAMA MEDICAL CENTER**
**PROGRESS NOTES**

| FAMILY NAME | FIRST NAME | MIDDLE NAME |
|---|---|---|
| ATTENDING PHYSICIAN | ROOM NO. | HOSP. NO. |
| DATE | | 19 |

| DATE | NOTES |
|---|---|

(cont) me only one time. (As before, specific details would be available in my medical records.)

(4.) After my prescription refills ran out on the medications prescribed by Dr. Lim (provided during my time at Mayo Clinic - Jacksonville), my father has been re-newing these same prescriptions on my behalf. From the time I departed Mayo Clinic in Jacksonville (approximately mid July 2000), until the date of this application, my primary treating family physician has been my father (J.R. Herring, M.D. - Internal Medicine Associates, Opelika, AL).

Part B.

(1) In 1981, while working as an orderly at Chambers County Hospital in Lafayette, Alabama, I sustained an injury to my lower back. I was subsequently evaluated and treated by Dr. Robert Burney, a Neurosurgeon who practiced in Opelika, AL. After a workup, I was diagnosed with a herniated lumbar disc, which did require surgery. During this time, Dr. Burney prescribed various medications to me for treatment of my symptoms. I cannot recall the specific names or types of medications, but this information should be readily available in the medical records you obtain from Dr. Burney's office, which I believe is still located in Opelika, AL.

(2) Around 1985, or to the best of my memory, the mid 1980's, I began to experience increasing episodes of low back pain, at which time I began seeing Dr. Max Burr at the Hughston Clinic,

(cont)

**MEDICAL CENTER**
**PROGRESS NOTES**

| FAMILY NAME | FIRST NAME | MIDDLE NAME |
|---|---|---|
| ATTENDING PHYSICIAN | ROOM NO. | HOSP. NO. |
| DATE | | 19 |

| DATE | NOTES |
|---|---|

(con't) located in Columbus, Georgia. After an extensive evaluation, Dr. Burr treated me with some medications for pain/inflammation (unable to recall specific names of meds), and referred me to physical therapy, also located within the Hughston Clinic. In addition, during my evaluation, Dr. Burr referred me to a psychologist who also saw me at the Hughston Clinic facility. I am unable to recall his name, and to the best of my memory, only visited with him on one occassion. Details regarding my evaluation, including the name of this psychologist and number of visits (as well as what recommendations may have been made), and other additional studies or tests performed, would all be contained in my medical records from Dr. Burr's office at the Hughston Clinic (Columbus, GA). If my memory serves me correctly, Dr. Burr and his staff at the Hughston Clinic, evaluated and treated me on a number of occasions from approximately mid 1980's (≈ 1985) through the early 1990's (≈ 1992-93).

(3) I continued to experience significant problems with low back pain, despite a prolonged course of conservative treatment, and required a surgical fusion of my lower back by Dr. Burr in 1987. During this time, including post-operatively, I was treated with several prescription medications, along with a course of physical therapy, etc... Specific details can be obtained from my Hughston Clinic medical records.

(4) A couple of years after my fusion surgery, I developed recurring bouts of low back pain, and sought re-evaluation by Dr. Burr. If I remember correctly, additional studies including MRI and EMG were performed, and did not show any worrisome, or new findings. Treatment consisted of prescribed medications along with physical therapy at
(con't)

EAST ALABAMA MEDICAL CENTER
PROGRESS NOTES

| FAMILY NAME | FIRST NAME | MIDDLE NAME |
|---|---|---|
| ATTENDING PHYSICIAN | ROOM NO. | HOSP. NO. |
| DATE | | 19 |

| DATE | NOTES |
|---|---|

(Cont) the Hughston Clinic in Columbus, GA. (Again, additional, more specific information can be obtained from my medical records.)

(5) During this time frame that I underwent various episodes of evaluation and/or treatment by Dr. Burr, I also periodically saw Dr. Joanne Smith T (an internist in practice with my father's group, Internal Medicine Associates - Opelika, AL). Both Dr. Burr and/or Dr. Smith T were involved in treating me during recurring episodes of low back pain. These treatments frequently involved the use of various prescription medications, based on my current symptoms. In addition, Dr. Smith T would also periodically see and evaluate me for other various ailments/illnesses ranging from the "usual" colds, flu, upset stomach, etc... to other symptoms such as lightheadedness, dizziness, heart palpitations, etc... Information regarding these evaluations and treatments can be obtained from copies of my medical records.

(6) As best as I can recall, during the early 1990's (1990-91), while in consultation with Dr. Smith T about recurrent spells of low back pain, she suggested I seek the services of a local psychologist, Dr. Charles Rubio (whose office was, & still is as far as I am aware, located in Opelika, AL). During this time, Dr. Rubio had a medical affiliation with a local psychiatrist, Dr. Rohini Reddy. As part of my overall treatment, Dr. Reddy prescribed some medication(s) which I believe were for depression (mood disorder), chronic pain, and/or other related problems. I cannot definitely tell you what the actual diagnoses were, nor do I recall the names of medications prescribed during this time, but all of this information should be available in my medical records. As best as I can recall, Dr. Rubio (and/or Dr. Reddy) treated me on a semi-regular (Cont)

**EAST ALABAMA MEDICAL CENTER**
**PROGRESS NOTES**

| FAMILY NAME | FIRST NAME | MIDDLE NAME |
|---|---|---|
| ATTENDING PHYSICIAN | ROOM NO. | HOSP. NO. |
| DATE | | 19 |

| DATE | NOTES |
|---|---|

(cont) basis, possibly up to or around mid 1992, at which time I began medical school.

(7.) In May 1992, while working as an orderly at East Alabama Medical Center (a.k.a. Lee County Hospital) in Opelika, AL, I re-injured my lower back while pulling/lifting a patient. Initially, I saw Dr. Smith T, who prescribed me some pain/anti-inflammatory type medications, and arranged for a Referral to Dr. Burr at the Hughston Clinic (Columbus, GA). As I recall, Dr. Burr re-assessed me, and treated me with some prescribed medications and also sent me back over to physical therapy. (Medical Records from these facilities should provide you with any needed additional information.)

(8.) To the best of my memory, I saw no other doctors from the time I entered medical school (mid-latter 1992), and during my time in school, up to my graduation in the spring of 1996. After graduation I relocated to Jacksonville, Florida where I completed a Residency in Internal Medicine (1996→1999). I remained an additional year in an employment capacity, completing a fellowship as Chief Resident - Internal Medicine at Mayo Clinic - Jacksonville (1999-2000). Approximately mid July 2000, I relocated to Opelika, Alabama and became a practicing physician associated with my father's group, Internal Medicine Associates. As of the time of this application process, and of this addendum, I currently remain in active practice and associated with this group.

Nurs. Serv. Form #141